# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 CR 312 | DATE | 7/22/2003 |
| CASE TITLE | USA vs. Labs of Virginia, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants Stern and Henley's renewed motion to dismiss Count Five of the Indictment is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | |
|---|---|---|---|
| | No notices required. | | Document Number |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUL 23 2003 | |
| ✓ | Docketing to mail notices. | date docketed | 102 |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | | |
| RO | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 02 CR 0312 |
| ) | |
| LABS OF VIRGINIA, INC., ) | Judge Ruben Castillo |
| DAVID M. TAUB, ) | |
| CHARLES J. STERN, and ) | |
| WILLIAM CURTIS HENLEY III ) | |

## MEMORANDUM OPINION AND ORDER

Presently before the Court is Defendants Charles J. Stern and William Curtis Henley III's renewed motion to dismiss Count V of the indictment on the grounds that certain Government responses to the bill of particulars now demonstrate that a part of the Government's proof would require this Court to invalidate an official act of the Indonesian government, which is barred under the act of state doctrine. For the following reasons, the motion is denied. (R. 94-1.)

## RELEVANT FACTS[1]

The United States of America and Indonesia became parties to the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") in 1974 and 1979, respectively. CITES was enacted as a result of a growing recognition "that international cooperation is essential for the protection of certain species of wild fauna and flora against over-exploitation through international trade." See CITES, Mar. 3, 1973, 27 U.S.T. 1087, T.I.A.S. No. 8249, Preamble. Indeed, in the spirit of international cooperation, CITES requires contracting states to "take appropriate measures to enforce the provisions of the [treaty] and to prohibit trade

---

[1] The following facts are taken from the indictment. *United States v. Andrews*, 749 F. Supp. 1520, 1521 (N.D. Ill. 1990) (for purposes of a motion to dismiss court assumes the facts alleged in the indictment are true).



in specimens in violation thereof." *Id.*, Art. VIII, § 1. Under the terms of the treaty, "[t]he Parties shall not allow trade in specimens of species [listed in three attached appendices] except in accordance with the provisions of [the treaty]." *Id.*, Art. II. Appendix II to CITES includes wildlife species that may become endangered if trade in those species is not strictly limited. Accordingly, species listed in Appendix II may not be exported or imported unless accompanied by a valid foreign export permit from the country of origin. An export permit shall be granted only when the following conditions have been met: "(a) the Scientific Authority of the State of export has advised that such export will not be detrimental to the survival of that species; (b) a Management Authority of the State of export is satisfied that the specimen was not obtained in contravention of the laws of that State for the protection of fauna and flora; and (c) a Management Authority of the State of export is satisfied that any living specimen will be so prepared and shipped as to minimize the risk of injury, damage to health or cruel treatment." *Id.*, Art. IV. Long-tailed, crab-eating macaque monkeys are listed on Appendix II.

The United States Fish and Wildlife Service ("USFWS") issues regulations to enforce CITES within the United States. All wildlife imported into the United States must first be inspected by the USFWS and United States Customs Service personnel. The Lacey Act, 16 U.S.C. § 3371 *et seq.*, is one of the statutes governing the importation of species covered by CITES into the United States. The Lacey Act prohibits the import, export, transportation, sale, receipt, acquisition or purchase in interstate or foreign commerce of any fish or wildlife taken, possessed, transported or sold in violation of any law or regulation of any State or in violation of any foreign law. 16 U.S.C. § 3372(a)(2)(A).

2

Defendants are involved in breeding and selling primates for medical research. In about May 1996 Defendant Labs of Virginia ("Labs") learned that Inquatex, an Indonesian company in the business of capturing, breeding and exporting primates, was selling a breeding colony of long-tail, crab-eating macaque monkeys. Labs, through Defendants Taub, Stern and Henley, began negotiations to purchase the Inquatex breeding colony. One of Labs's employees traveled to Indonesia to inspect the Inquatex colony in June 1996. According to the indictment, the employee learned, and reported back to Taub, Henley and Curtis, that the colony contained almost 1,400 crab-eating macaques, of which 668 were wild-caught and 762 were captive-bred. The indictment also alleges that the employee informed the defendants that importing wild-caught macaque monkeys was against Indonesian law and that Inquatex had bribed government officials to obtain permits for their release.

In late July 1996 Labs prepared a purchase agreement for the Inquatex colony and arranged for the first shipment of crab-eating macaques. In January 1997 the parties signed the purchase agreement for approximately 1,312 crab-eating macaques. The agreement stipulated that each party was to provide the other with all necessary applications and documents filed as a part of the permit process. Subsequently, the Inquatex colony was shipped to the United States in seven separate shipments; four shipments entered the United States at O'Hare International Airport in Chicago. A Labs employee was present at Inquatex prior to each shipment to monitor the selection and preparation of the monkeys for shipment to the United States. The indictment alleges that the four O'Hare shipments contained a mix of wild-caught and captive-bred monkeys; the permits and health certificates for each shipment, however, falsely specified that the shipments contained only captive-bred monkeys.

The Government charged Defendants with violating various provisions of the Lacey Act, 16 U.S.C. § 3371 *et seq.*, and other import laws, 18 U.S.C. § 545; 50 C.F.R. § 14.105(b)(2) in a twelve-count indictment. Defendants Stern and Henley were charged in Count V with illegal trafficking of species protected under Indonesian law. *See* 16 U.S.C. § 3372(a)(2)(A). Following their indictment Stern and Henley moved to dismiss Count V under the void-for-vagueness doctrine, the act of state doctrine and for failure to allege a predicate act or factual basis for the charge. Additionally, the defendants moved for a bill of particulars, seeking information to clarify the Government's theory of the case as well as facts relating to Henley and Stern. We denied the motion to dismiss Count V, (R. 79-1), but granted the motion for the bill of particulars (R. 82-1). Based on the Government's responses to the defendants' bill of particulars, Stern and Henley renewed their motion to dismiss Count V in April 2003, which is presently pending before this Court.

## LEGAL STANDARDS

To withstand a motion to dismiss pursuant to Federal Rule of Criminal Procedure 12, an indictment must include the essential elements of the crimes alleged therein. *United States v. Torres*, 191 F.3d 799, 804 (7th Cir. 1999). An indictment, or a portion thereof, may be dismissed if it is otherwise defective or subject to a defense that may be decided solely on issues of law. *See, e.g., United States v. Tallant*, 407 F. Supp. 878, 885 (N.D. Ga. 1975).

**ANALYSIS**

Count V of the indictment charges Stern and Henley with misdemeanor violations of §§ 3372(a)(2)(A) and 3373(d) of the Lacey Act.[2] As noted above, those sections make it unlawful "to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce – any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law." 16 U.S.C. § 3372(a)(2)(A). "[A]ny person who knowingly engages in conduct prohibited by any provision of this chapter . . . and in the exercise of due care should know that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in a manner unlawful under, any underlying law, treaty or regulation shall be fined . . . or imprisoned . . ., or both." 16 U.S.C. § 3373. The combined statutory scheme under the Lacey Act for trafficking misdemeanors requires the Government to prove the following four elements: (1) the wildlife at issue is covered by the Lacey Act; (2) the wildlife was taken, possessed, transported, or sold in violation of a wildlife-related state, federal, or foreign law or regulation; (3) the defendants imported, exported, transported, received, acquired, or purchased the illegal wildlife or attempted to do so; and (4) the defendants knew or should have known of the wildlife's illegality. 16 U.S.C. §§ 3372, 3373; *see also* Robert S. Anderson, *The Lacey Act: America's Premier Weapon in the Fight Against Unlawful Wildlife Trafficking*, 16 Pub. Land L. Rev. 27, 58 (1995).

---

[2] Count V states in pertinent part: "Defendants did knowingly import wildlife in interstate and foreign commerce . . . and in the exercise of due care should have known that the wildlife was transported and sold in violation of a foreign law, namely, Decree No. 26/kpts - 11/94, which imposed a ban on the transportation from Indonesia, that is, the export of wild-caught Macaca fascicularis; In violation of Title 16, United States Code, Sections 3372(a)(2)(A) and 3373(d)(2)."

The first prong is satisfied because the indictment properly alleges that Defendants violated the Lacey Act when they imported wild-caught, crab-eating macaques, a species protected under Indonesian law and thus covered by the Lacey Act. The defendants have not challenged the third and fourth prongs and the Government properly alleges the requisite acts and knowledge by the defendants. Thus, at issue in the present motion is whether the Government sufficiently alleges that the wildlife was taken, possessed, transported or sold in violation of a wildlife-related foreign law or regulation. In this case, the indictment alleges that the shipments at issue violated the Decree of the Indonesian Minister of Forestry No. 26/Kpts-11/94, which bans the export of wild-caught crab-eating macaques but not captive-bred macaques.[3]

Defendants argue, however, that the indictment is defective in light of the admissions contained within the bill of particulars either because: (1) it is now clear that the Indonesian government did intend to approve the export of the entire colony (albeit through bribery) and thus there was no violation of Indonesian law; or (2) in order to establish a violation of Indonesian law, as the Government is required to do under the Lacey Act, it will necessarily have to show that the Indonesian government's approval of the exports was improper or corrupted,

---

[3] The Decree of the Indonesian Minister of Forestry, 26/kpts-II/94 states: "Considering (a) that long-tail macaque . . . are wild animal species which are not protected by the law and used by human (people), however, in natural process, these species has been decreased . . . (c) that to keep that the use of long-tail macaques . . . can be implemented sustainably and will not extinct, especially for export purposes, they must be from breeding efforts; (d) that in conjunction with the above matters it is necessary to decide . . . To Stipulate Firstly: The use of long-tail macaque . . . species for export purposes must come from breeding efforts; Secondly: Exporters for those species . . . must meet obligation of the breeding efforts by themselves, in line of the existing and valid regulations; Thirdly: (1) the number of animal/species which can be exported by licensed exporters is based on export quota decided by the Department of Forestry; (2) the decision of the export quota of animal/species as mentioned in the First point, after investigated/evaluated by the Accreditation Team, be based on the result of breeding efforts. 1/20/94"

which is an inquiry barred under the act of state doctrine. Specifically, Defendants argue that their first motion to dismiss was denied based on the Government's representation at the time that the required violation of Indonesian law could be established without second-guessing Indonesia's decision making because Indonesia intended to authorize export of only captive-bred monkeys, in keeping with Indonesian law. Defendants contend that the Government has changed course and now admits that the Indonesian government did intend to approve the export of the entire colony, including wild-caught monkeys, because they did so as a result of a bribery scheme. Thus, Defendants reason, Count V must now be dismissed under the act of state doctrine. Alternatively, the defendants also hint in their reply brief that no violation of Indonesian law occurred because the Indonesian government approved, by issuing CITES permits, the export of the wild-caught monkeys. According to Defendants the "dispositive fact" is that "the Indonesian government in fact approved the export of the wild-caught monkeys alleged to have been exported in violation of Indonesian law," (R. 100, Defs.' Reply at 4), and "[a]ccordingly, the prosecution's contention that it is 'seeking to uphold the Indonesian Decree' ... is nothing less than a direct challenge to Indonesia's own determination that the exports comported with the Decree," (id. at 7).

First, any argument that Indonesian law was not violated because an Indonesian official issued a permit for the shipments is wholly without merit. The CITES permits issued in Indonesia approved the export only of captive-bred monkeys. Thus, whether or not an Indonesian official was paid to ignore the fact that wild-caught monkeys were also included in the shipments is irrelevant to the question of whether the law was broken (i.e., were wild-caught monkeys exported?). To use an analogy a little closer to home, if a truck driver bribes an employee of the

7

Illinois Secretary of State's office in order to obtain a license without passing the requisite tests, Illinois law nevertheless is violated despite the fact that the truck driver walks away that day with a license to drive. The violation is not erased by the bribed official's earlier imprimatur. Similarly, the Indonesian decree was violated when wild-caught, crab-eating macaques were removed from the country, regardless of the actions and motivations of the Indonesian officials issuing the permits.

A similar analysis also colors our disposition of Defendants' act of state doctrine arguments. The act of state doctrine prohibits United States courts from sitting in judgment of official acts taken by another country within its own borders that might frustrate the conduct of foreign relations by the political branches of the government. *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp. Int'l*, 493 U.S. 400, 408 (1990). The policies underlying the doctrine include "international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations." *Id.*; *United States v. 2,507 Live Canary Winged Parakeets*, 689 F. Supp. 1106, 1120 (S.D. Fla. 1988). Thus, the doctrine requires that courts "not adjudicate a politically sensitive dispute which would require the court to judge the legality of the sovereign act of a foreign state." *MOL, Inc. v. The Peoples Rep. of Bangl.*, 572 F. Supp. 79, 83 (D. Or. 1983) (internal citations and quotations omitted). That is, act of state issues arise only when "a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign. When that question is not in the case, neither is the act of state doctrine." *W.S. Kirkpatrick*, 493 U.S. at 406.

Defendants offer several reasons why the act of state doctrine should apply in this case. First, Defendants posit that the Government must prove as a part of its case that the issuance of the permits was corrupted by bribery and that the outcome of the case turns upon the effect of the alleged bribery on the issuance of the permits and the export of the monkeys. The Government responds that Count V does not implicate the act of state doctrine because it does not require this Court to inquire into the validity or legality of any public act by the Indonesian government. Rather, according to the Government, the relevance of the bribery allegations goes only to whether the defendants knew that the shipments contained wild-caught monkeys even though the permits for the shipments specified captive-bred monkeys. The Government further contends that its responses to the bill of particulars does not alter this fact because it could prove its case without any reference to the alleged bribery. Accordingly, the Government concludes that nothing in this case with respect to the Indonesian official's actions in issuing the permits requires this Court to "declare invalid, and thus ineffective . . . the official act of a foreign sovereign." *Id.* at 405.

We agree. As noted above, this case does not turn on whether the permits were issued as a result of bribery; Indonesian law was broken when the wild-caught monkeys left the country. In this way, the present case is analogous to the Supreme Court's decision in *W.S. Kirkpatrick*. In that case a competitor of a company that had obtained a military contract with the Nigerian government through bribery sued the contracting company under racketeering and antitrust statutes. The defendant asserted that the act of state doctrine necessitated dismissal of the suit because in order to prevail the plaintiff would have to show that the defendants intended to wrongfully influence the Nigerian government through a bribe, that the Nigerian government

9

knew of the bribe, accepted it and that but for the bribery the plaintiff would have been awarded the contract instead. *Id.* at 402. The Supreme Court rejected this argument, holding that "[r]egardless of what the court's factual findings may suggest as to the legality of the Nigerian contract, its legality is simply not a question to be decided in the present suit, and there is thus no occasion to apply the rule of decision that the act of state doctrine requires." *Id.* at 406. Similarly, the outcome of this case does not turn upon whether the CITES permits were procured through bribery; Indonesian law was violated when the wild-caught monkeys left the country, regardless of the permit issuer's intent.

Next Defendants claim that the act of state doctrine should apply because Count V impinges on international comity and the need to avoid embarrassment to the Executive Branch in its conduct of foreign relations. But this case is an enforcement action *brought by* the Executive Branch that implicates a treaty signed by both countries. Both the United States and Indonesia have committed to uphold the CITES treaty and its underlying principles and both countries have enacted legislation or decrees to that end. As discussed below, the existence of a controlling treaty alters the parties' otherwise-unfettered interaction. Accordingly, when both states are parties to a binding treaty, concerns of international comity and conduct of foreign relations are minimized because the United States and the foreign government have already agreed, at least to some extent, on the principles governing their conduct.

Finally, Defendants point out that export decisions traditionally are considered sovereign acts covered by the act of state doctrine. But the cases Defendants cite are inapposite. *See World Wide Minerals, Ltd. v. Rep. of Kaz.*, 296 F.3d 1154, 1165 (D.C. Cir. 2002); *MOL, Inc.*, 572 F. Supp. at 85-86; *Bokkelen v. Grumman Aerospace Corp.*, 432 F. Supp. 329, 333 (E.D.N.Y. 1977).

10

First, as the Government notes, each of those cases involved situations where a foreign government *denied* an application for a license to remove resources from or to carry on business within that country. Even more importantly, the foreign governments' decisions in those cases were taken in the absence of a controlling treaty to guide or govern their actions. In the present case Indonesia, by becoming a party to CITES, subjected itself to the treaty's principles and provisions, which included a commitment to "take appropriate measures to enforce the provisions of the [treaty] and to prohibit trade in specimens in violation thereof" and specifically to not "allow trade in specimens of species [listed in three attached appendices] except in accordance with the provisions of [the treaty]." Signatory states to a treaty such as CITES effectively relinquish some measure of sovereignty in domestic affairs for perceived advantages abroad or simply for the common good; treaty provisions are binding on its parties and must be performed in good faith. Gregory H. Fox, *The Right to Political Participation in International Law*, 17 Yale J. Int'l L. 539, 543 (1992); Restatement (Third) of the Foreign Relations Law of the United States § 321 (1987). Thus the situation in the present case differs from those cited by Defendants where the government made unilateral, quasi-commercial and wholly sovereign decisions to issue or deny export licenses.[4] In this case the CITES treaty established a framework that influenced, if not dictated, Indonesia's export decisions generally and with respect to these particular monkeys. *See 2,507 Live Canary Winged Parakeets*, 689 F. Supp. at 1120 (rejecting act of state doctrine defense and noting "[t]he purpose of CITES is to further international

---

[4] In *MOL, Inc.*, the court held that the act of state doctrine barred the court's inquiry into the Bangladeshi government's decision to cancel Plaintiff's license to export rhesus monkeys. Notably, however, that decision was made prior to the date Bangladesh became a signatory to the CITES treaty.

11

cooperation in assisting other countries in the enforcement of their wildlife protection laws"). Thus the fact that this case involves export decisions does not automatically warrant application of the act of state doctrine.

We also note for the sake of completeness that even if we were to hold that the act of state doctrine was properly invoked in this case, we are convinced that several exceptions to the doctrine would vitiate its application. In *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964), the Supreme Court carved out a potential exception to the act of state doctrine when it held that the judicial branch "will not examine the validity of a taking of property within its own territory by a foreign sovereign government . . . *in the absence of a treaty or other unambiguous agreement regarding controlling legal principles* . . . ." *Id.* at 428 (emphasis added); *see also Jimenez v. Aristeguieta*, 311 F.2d 547, 558 (5th Cir. 1962) (act of state doctrine does not bar inquiry into validity of sovereign act where there is a treaty defining controlling international law as in the present case where parties acted pursuant to a treaty of extradition that expressly contemplated judicial review of official's action). As noted above, both the United States and Indonesia are parties to CITES, a treaty whose controlling principles influence not only what species may be exported but also the permit process and enforcement of the treaty's provisions. Because the CITES treaty's unambiguous legal principles govern this process, the treaty exception to the act of state doctrine applies in this case.[5]

---

[5] The corruption exception to the act of state doctrine also seems applicable in this case. Under this exception, "even an unrepudiated act of state may be scrutinized by the courts if it resulted from the corruption of government officials." *Dominicus Americana Bohio v. Gulf & W. Indus., Inc.*, 473 F. Supp. 680, 690 (S.D.N.Y. 1979) (*citing Hunt v. Mobil Oil Corp.*, 550 F.2d 68 (2d Cir. 1977)). This exception rests on the concept that allegations of wrongdoing on the part of foreign sovereigns' agents are "beyond the umbrella of the Act of State Doctrine" because "such activity would be violative of the Foreign Corrupt Practice Act of 1977 . . . and . . . to shield such

12

## CONCLUSION

For the reasons set forth herein, we deny Stern and Henley's renewed motion to dismiss Count Five of the indictment. (R. 94-1.)

ENTERED: /s/ Ruben Castillo
Judge Ruben Castillo
United States District Court

**Dated: July 22, 2003**

---

activity would be violative of the spirit of the Act." *See Sage Int'l, Ltd. v. Cadillac Gage Co.*, 534 F. Supp. 896, 910 (E.D. Mich. 1981). Thus, even if we were to hold that the bribery is relevant to establishing a violation of Indonesian law for purposes of the Lacey Act, Count V would survive under this exception to the act of state doctrine.

13